UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| In Re Dial Complete Marketing and Sales | ) | MDL Docket No. 11-md-2263-SM |
| Litigation (MDL No. 2263) | ) | ALL CASES |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**EXPERT REPORT OF KEITH R. UGONE, PH.D.**

**April 24, 2013**

# EXPERT REPORT OF KEITH R. UGONE, PH.D.

## April 24, 2013

I.    OVERVIEW OF ASSIGNMENT ................................................................. 1

II.   QUALIFICATIONS AND EXPERIENCE ................................................ 2

III.  METHODOLOGY ...................................................................................... 3

IV.   SUMMARY OF OPINIONS ...................................................................... 4

V.    OPINIONS .................................................................................................. 7

   A.  Claimed Injury And Damages Cannot Be Reliably Calculated On A Class-Wide Basis .................................................................................................... 7

     1.  Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing Dial Complete ................................................ 7

     2.  Individual Inquiry Is Required To Determine The Price Paid For Dial Complete By Each Putative Class Member ........................................... 9

       i.   Analysis Of Retail Sales And Pricing Data Demonstrates Significant Variations In Retail Prices Of Dial Complete........................... 10

       ii.  The Named Plaintiffs' Testimony Reflects The Variability In Dial Complete's Retail Prices And The Difficulty Of Ascertaining Injury .......... 16

       iii. Summary........................................................................................ 20

   B.  The Claimed Damages Measures Proposed By Dr. Rosen Do Not Yield An Appropriate Or Reliable Measure Of Economic Harm ............................... 21

     1.  Dr. Rosen's Price Premium Methodology Is Incomplete And Unreliable .......... 22

       i.   Dr. Rosen's Price Premium Approach Does Not Provide A Method Of Establishing Injury On A Class-wide Basis.................................... 22

       ii.  Dr. Rosen Provides An Incomplete Description Of How A Price Premium Attributable To The Challenged Claims Could Be Identified......... 23

       iii. Dr. Rosen's Preliminary Analysis Fails To Provide Evidence Of A Price Premium Attributable To The Challenged Claims ........................ 25

       iv.  Dr. Rosen's Assertion That The Challenged Claims "Elevated The Price" Of Dial Complete Is Flawed And Inconsistent With Economic Evidence In This Matter........................................................... 35

     2.  Dr. Rosen's Total Purchase Price, Wholesale Price, And Profit Contribution Proposed Approaches Are Neither Relevant Nor Reliable................................... 37

# EXPERT REPORT OF KEITH R. UGONE, PH.D.

## April 24, 2013

## I.    OVERVIEW OF ASSIGNMENT

1.    I am an economist and have been retained by counsel for The Dial Corporation ("Dial") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *In Re Dial Complete Marketing and Sales Practices Litigation.* I understand the Named Plaintiffs[1] allege that Dial has engaged in misleading marketing, labeling, packaging, and advertising of Dial Complete (the "Challenged Product").[2] I also understand that the Named Plaintiffs alleged they have suffered economic injury as a result of the allegedly misleading representations ("Challenged Claims") made concerning Dial Complete.[3]

2.    I have been requested by counsel for Dial to independently evaluate from an economic perspective:

a.    whether accepted economic techniques and analyses can be used to determine on a Class-wide basis whether members of the Class suffered any economic injury and, if so, whether the extent of that injury can be determined on a Class-wide basis; and

b.    the opinions contained in the expert report submitted by Dr. Harvey Rosen in support of class certification in this matter.[4]

---

[1] The current Named Plaintiffs in this matter are Eric Capdeville, Michele Carter, Jonathan Cessna, Alicia Gentile, Sonia Herrera, Jennifer Marazzi, Kristina Pearson, Megan Peterson, Sven Vogtland, David Walls, and Elizabeth Poynter. Two former Named Plaintiffs are Bridget Delivorias and Amani El-Jandali. The Named Plaintiffs seek certification of eight separate state-wide Classes (i.e., Arkansas, California, Florida, Illinois, Louisiana, Missouri, Ohio, and Wisconsin). Each putative Class consists of all persons from each identified state who purchased Dial Complete "for household use" from "Dial Complete's commercial launch in 2001 through the present." (Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, p. 1.)

[2] Consolidated Amended Class Action Complaint ("Complaint"), pp. 1 – 3.

[3] Consolidated Amended Class Action Complaint ("Complaint"), pp. 3 and 8. Among other things, Plaintiffs challenge Dial's claims that Dial Complete "kills 99.99% of germs," "kills more germs than other liquid hand soaps," and is "Doctor Recommended." (Complaint, p. 12.)

[4] Expert Report prepared by Dr. John F. Burke, Jr., Ph.D. and Dr. Harvey S. Rosen, Ph.D. dated November 15, 2012 ("Rosen Report").

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

---

## II.    QUALIFICATIONS AND EXPERIENCE

3.    I am a Managing Principal at Analysis Group, Inc. ("AG").  AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models.  Nationally, AG consists of approximately 600 professionals who specialize in, among other things, the fields of economics, accounting, finance, statistics, and strategy consulting.

4.    My primary responsibility at AG is to provide economic, financial, and/or damages-related consulting services to clients.  Throughout my career I have provided these consulting services in class certification matters, breach of contract cases, intellectual property cases, antitrust cases, fraud-related cases, business tort cases, business interruption cases, employment / loss of earnings matters, lender liability cases, and securities-related cases.  I have submitted reports on class certification issues numerous times.  I have provided expert testimony in deposition and trial settings numerous times.

5.    I specialize in the application of economic principles to complex commercial disputes, and I am generally retained in cases requiring economic, financial, and/or damages-related analyses. Financial models I have constructed or evaluated in the past have contained as components revenue analyses, cost analyses, assessments of capacity, assessments of profitability, assessments of reasonable royalties, and assessments of the competitive business environment.  I also have evaluated various claims of economic value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams.  During the course of my career, I have frequently

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

___

performed economic analyses using large databases of information and complex computer models.

6.      I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983.   Attached as **Exhibit 1** is a true and correct copy of my current resume.   A listing of publications I have authored is contained in my resume.   Attached as **Exhibit 2** is my trial and deposition testimony experience.   My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

7.      AG is being compensated based upon hours incurred and the hourly rates of the personnel involved.   Payment to AG is not contingent upon my findings or the outcome of this matter.   AG is being compensated at a rate of $570 per hour for my time.

## III.    <u>METHODOLOGY</u>

8.      My opinions in this matter are based upon (a) my economics and damage quantification training and experience, (b) documentary evidence, (c) deposition testimony, and (d) sales and pricing data collected by the SymphonyIRI Group ("IRI").   The facts, data, and information available to me in forming my opinions are identified in **Exhibit 3** or elsewhere in my report (including footnotes and exhibits).   **Exhibit 4** provides a list of deponents whose deposition transcripts are cited in my report.   In addition, I have participated in discussions with Dial personnel.

9.      In forming my opinions, I have evaluated (a) the extent of variability in putative Class members' reasons for purchasing Dial Complete and (b) the extent of variability in the prices paid for Dial Complete (and other hand soap products).

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

    a.   <u>Evaluation Of Reasons For Purchase</u>.  In order to assess the variability in putative Class members' reasons for purchasing Dial Complete, I reviewed (i) Dial personnel's deposition testimony, (ii) consumer research and marketing studies related to Dial Complete and other liquid hand soaps, and (iii) customer reviews of Dial Complete.

    b.   <u>Evaluation Of Prices Paid</u>.  In order to evaluate the extent of variability in prices paid for Dial Complete, I examined (i) weekly retail sales and pricing data collected by IRI during the time period from 2009 to December 2, 2012, (ii) Dial market pricing reports for selected weeks in 2008 and 2009,[5] and (iii) Dial coupon redemption data for the 2007 to October 2012 time period.  Using this data, I analyzed the extent to which retail pricing for Dial Complete varied depending upon promotions utilized, sales channel, retailer, geographic location, year of purchase, and product size purchased.  For the purpose of evaluating Dr. Rosen's proposed price premium approach, I used this same data to analyze the extent of variability in price *differences* between Dial Complete and other hand soap products.

10.    My analyses and opinions are based upon the information available, standard economic theory, and my education and training.  The information I am relying upon is information typically relied upon by experts in my field.  I reserve the ability to (a) review documents, deposition transcripts, expert reports, or other information still to be produced by the Parties to this dispute and (b) supplement my opinions based upon that review, if appropriate.

## IV.   <u>SUMMARY OF OPINIONS</u>

11.    Based upon a detailed analysis, I have reached the following opinions and conclusions.

    a.   Accepted economic techniques and analyses cannot be used to reliably calculate injury and damages in this matter on a Class-wide basis.

    b.   The approaches proposed by Dr. Rosen to calculate Class-wide damages are not reliable for determining or quantifying actual harm in this case.

_____

[5]  Each market pricing report provides information relating to regular and promotional pricing for Dial Complete and certain competitors in six stores in a given geographic area.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

___

### A. <u>**Claimed Injury And Damages Cannot Be Reliably Calculated On A Class-Wide Basis**</u>

12.      Even if the Challenged Claims are assumed (for purposes of this analysis) to be false, whether a putative Class member was injured as a result of those claims would depend upon (a) the reasons for the putative Class member's purchase of Dial Complete and (b) the specific price paid by the putative Class member for Dial Complete.   Based upon the analyses presented throughout this report, there is substantial variability in the reasons for purchase and prices paid across putative Class members.   Therefore, it would be necessary to examine individual purchase decisions and individual purchase prices paid in order to determine whether and to what extent any particular Class member was economically injured.

a.      <u>Reasons For Purchase</u>.   Documentary evidence and deposition testimony indicate that consumers purchase Dial Complete (and other hand soap products) for a variety of reasons, many of which are unrelated to the Challenged Claims (e.g., foaming action, fragrance, and Dial brand).   Purchase drivers are not common across all purchasers of Dial Complete.   In other words, different consumers purchase for different reasons.   From an economic perspective, a person who purchased Dial Complete for reasons other than the Challenged Claims (e.g., a person who purchased because of fragrance) and who would have purchased the same soap at the same price regardless of the alleged misleading labeling or advertising was not injured as a result of the Challenged Claims.   In economic terms, that purchaser received the value that was paid for.   Given that putative Class members may have purchased Dial Complete for a variety of reasons unrelated to the Challenged Claims, it would be necessary to examine individual purchases to evaluate whether and to what extent any particular Class member suffered an injury.

b.      <u>Prices Paid For Dial Complete</u>.   My analyses of IRI retail sales and pricing data, Dial market pricing reports, and Dial coupon redemption data indicate that   Under these varied conditions, to determine the actual price paid by any particular putative Class member (and whether there was any price premium paid associated with the Challenged Claims) would require consideration of circumstances particular to that transaction.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

13.    Due to the substantial variation in (a) consumers' reasons for purchasing Dial Complete

and (b) the prices paid for Dial Complete, individualized inquiry would be necessary to

determine whether any particular Class member suffered any injury and, if so, the *amount*

of damages.

### B.    Dr. Rosen's Proposed Approaches Would Not Yield An Appropriate Or Reliable Measure Of Economic Harm

14.    Dr. Rosen proposes to calculate claimed Class-wide damages by quantifying the

following disgorgement amounts: (a) any price premium paid by consumers for Dial

Complete relative to "alternative competing substitute products"; (b) the "total purchase

price paid by consumers"; (c) the "total wholesale price charged by Dial"; and (d) the

"profit contribution" accruing to Dial from sales of Dial Complete.[6]  As summarized

below, the approaches proposed by Dr. Rosen are unreliable for determining or

quantifying actual harm in this case.

   a.    <u>Dr. Rosen's Price Premium Methodology Is Incomplete And Unreliable</u>.  Dr. Rosen
proposes to award an average price premium regardless of individual reasons for
purchase or prices paid – which necessarily would over-compensate some putative
Class members and under-compensate others.  Further, Dr. Rosen's assertion that the
Challenged Claims "elevated the price" of Dial Complete is flawed and inconsistent
with economic evidence in this matter.  His "preliminary analysis" of a claimed price
premium fails to provide evidence of a constant or systematic premium attributable to
the Challenged Claims.  In addition, Dr. Rosen has not demonstrated that his
proposed approach actually could be implemented, especially in light of the
deficiencies in his "preliminary analysis" (e.g., use of an arbitrarily selected
benchmark product and failure to apportion the calculated price differential to the
Challenged Claims).

   b.    <u>Total Purchase Price, Wholesale Price, And Profit Contribution Proposed Approaches
Are Neither Appropriate Nor Reliable</u>.  These proposed approaches are not
appropriate or reliable because they would not account for (i) the value received by
putative Class members from purchases of Dial Complete, (ii) the reasons for
purchase other than the Challenged Claims, or (iii) the substantial variation in prices
paid by individual putative Class members.  In addition, these proposed approaches

---

[6] Rosen Report, pp. 2 – 3.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

would aggregate the total revenues or profits associated with Dial Complete without apportioning the amount attributable to the Challenged Claims. Under the proposed approaches, no correlation (or economic causation) would exist between the proposed measures and the sales and/or profits caused by the Challenged Claims.

15.    The details of my analyses and the bases for my opinions are contained in the remainder of this report.

## V.    OPINIONS

### A. Claimed Injury And Damages Cannot Be Reliably Calculated On A Class-Wide Basis

16.    Determining whether a putative Class member suffered any economic injury as a result of the Challenged Claims requires individualized inquiry into the circumstances associated with each Class member's purchases. The relevant inquiries include, *inter alia*, (a) the putative Class member's reasons for purchasing Dial Complete and (b) the specific price paid by the putative Class member for Dial Complete. These inquiries are required for each individual putative Class member in order to determine whether or not the individual was injured as a result of the Challenged Claims.

#### 1. Individual Inquiry Is Required To Determine Putative Class Members' Reasons For Purchasing Dial Complete

17.    From an economic perspective, a person who bought Dial Complete for a reason or reasons other than the Challenged Claims (e.g., a person who bought solely because of scent), and who would have bought the same soap at the same price regardless of the labeling or advertising, was not injured as a result of the Challenged Claims. In economic terms, that purchaser received the value that was paid for. Hence, these customers did not suffer economic injury as a result of Dial's Challenged Claims.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

18.     Documentary evidence and deposition testimony indicates that putative Class members purchase hand soaps (including Dial Complete) for many reasons unrelated to the Challenged Claims.

a.  <u>Deposition Testimony</u>.  Mr. Christopher Sommer, Vice President of Marketing for Personal Care at Dial,[7] testified that "many things" are important to consumers that purchase Dial Complete, including foam, color, and fragrance in addition to germ kill.[8]  Mr. Sommer further testified that "superior germ kill" was not necessarily the most important aspect of Dial Complete to consumers.[9]  Mr. Sommer testified that there are "many different selling points" for Dial Complete and "different segments of consumers look[] for different things."[10]

b.  <u>Liquid Hand Soap Consumer Research Studies</u>.  Dial produced consumer research studies in this matter relating to the liquid hand soap market.  These consumer studies indicated that consumers purchase hand soap products, including Dial Complete, for a variety of reasons and not solely based upon antibacterial qualities.

i.  In a Dial Complete consumer research study █████████████████████████████████████████████████████████████[11]████████████████████████████[12] Dial concluded from the study that ████████████████████████[13]

ii.  A hand soap consumer research study ███████████████████████████████████████████████████████████████████████████████[14]

c.  <u>Customer Reviews For Dial Complete</u>.  Customer reviews for Dial Complete on Amazon.com also indicate that customers purchased Dial Complete for a variety of

---

[7]  Deposition of Christopher Sommer taken on August 23, 2012 ("Sommer Deposition"), p. 119.

[8]  Sommer Deposition, pp. 237 – 238.

[9]  Sommer Deposition, pp. 239 – 240.

[10]  Sommer Deposition, pp. 296 – 301.

[11]  According to Dial, "Moms like foam for kids because it's less messy and more fun." (DIALCMPLT000126917R – 24R at 22R.)

[12]  Dial Complete NPD, p. 5.  (DIALCMPLT000128340 – 358 at 344.)

[13]  Dial Complete NPD, p. 5.  (DIALCMPLT000128340 – 358 at 344.)

[14]  LHS Competitive Overview, p. 16.  (DIALCMPLT000109697 – 716 at 712.)

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

reasons. I conducted a search on Amazon using the search term "Dial Complete Foaming 7.5oz." The search returned 137 results.[15] Of these 137 results, only 12 had customer reviews associated with them. In total, 40 customer reviews were available from these results. While one customer identified germ killing as a reason for purchase, many reported purchasing Dial Complete due to factors unrelated to germ killing or to any other of the Challenged Claims. Specifically, of the 40 customer reviews, (i) 1 customer identified germ killing as the reason behind purchasing Dial Complete, (ii) 10 identified scent, (iii) 5 identified the effect on their hands, and (iv) 5 identified foaming action/pump as reason(s) behind his/her purchase of Dial Complete.[16] (*See* **Exhibit 5** for specific quotes from these customer reviews.) These findings are consistent with the findings of the two consumer research studies noted above.

19.    Given that putative Class members may have purchased Dial Complete for a variety of reasons unrelated to the Challenged Claims, it would be necessary to examine individual Class members to determine whether and to what extent any particular Class member suffered any injury. This evaluation cannot be performed on a common basis using Class-wide proof.

**2.    Individual Inquiry Is Required To Determine The Price Paid For Dial Complete By Each Putative Class Member**

20.    The extent to which any individual Class member suffered economic harm also depends upon the price paid by that Class member for Dial Complete – especially relative to a comparable or benchmark product. The applicable transactions number in the millions over the putative 12-year Class period and occurred in hundreds of different locations and numerous different sales channels. There are too many individual variables affecting prices (including but not limited to place, channel, time, and discount utilized) and too

---

[15] A "result" is defined (in this instance) as a unique Dial Complete hand soap/wash product offering on Amazon.com (e.g., "Dial Complete Foaming Anti-bacterial Hand Wash Variety 4-Pack," "Dial Complete Antibacterial Foaming Hand Wash, 7.5 fl oz (221 ml)," "Dial Complete Foaming Hand Wash Soothing, White Tea, 7.5 Ounce," and "Dial Corp. 02936 Foaming Hand Soap, 7.5 oz., Original").

[16] These 40 results include customer reviews in which the customer identified multiple factors as purchase drivers, as well as reviews in which no purchase drivers were discussed. For this reason, the same review could be part of multiple categories and other reviews may not be part of any category listed.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

___

many actual prices paid for a Class-wide proof approach to be reliable and accurate, and not create windfall gains to a significant number of consumers.

21. Without individual inquiry, one cannot determine the price an individual Class member paid for Dial Complete or the extent to which the member did or did not pay a "price premium" – rendering attempts to quantify damages on a Class-wide basis under Dr. Rosen's proposed "price premium" approach inaccurate and unreliable. For example, an individual Class member who purchased Dial Complete for a price below that of a benchmark product did not pay a price premium for Dial Complete and suffered no economic injury. In addition, knowing the prices paid by individual Class members (which differed greatly across the Class members) would be an important factor in allocating total claimed damages to individual Class members under Dr. Rosen's three other proposed approaches (i.e., "total purchase price," "total wholesale price," and "profit contribution accruing to Dial").

     **i.   Analysis Of Retail Sales And Pricing Data Demonstrates Significant Variations In Retail Prices Of Dial Complete**

22. Analysis of IRI retail sales and pricing data, Dial market pricing reports, and Dial coupon redemption data demonstrates that ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Similarly, the price of a relevant benchmark product available to different putative Class members would vary greatly based upon these same factors. The examples presented in this section of my report focus on Dial Complete (7.5 ounce), which accounts for a significant

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

majority, but certainly not all, of Dial Complete sales as shown in **Exhibit 6.**[17]    The data

support the conclusion that that there is no single average purchase price that the Named

Plaintiffs can use to derive or calculate a price premium to evaluate claimed damages on

a Class-wide basis.    The data also support the conclusion that even for those Class

members who are determined through individualized inquiry to have been injured,

additional individualized inquiry would be necessary to determine the *amount* of

damages.

23.    <u>Dial Complete Prices Vary Depending Upon Promotional Activity</u>.    Large variations

between Dial Complete's non-promoted prices and promoted prices (i.e., on-sale prices)

exist in different sales channels and among retailers over the claimed Class period.

Hence, whether a Dial Complete purchase is made during an active promotion is

important in determining the actual prices paid by individual Class members (and the

amount of any alleged price premium).    This is especially true given that a significant

number of Class members would have purchased Dial Complete on sale.    According to

the IRI data, over the 2009 to December 2, 2012 time period, ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████    (**Exhibit 7.**)    Examples of the differences between non-promoted

prices and promoted prices of Dial Complete (7.5 ounce) are provided below.

---

[17] ██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

a. <u>Promotional Pricing By Sales Channel</u>.  Over the 2009 to December 2, 2012 time period, on average, non-promoted prices were ███████████████████ ████████████████████████████████████████████ **(Exhibit 8.)** An illustrative example of the differences between promoted prices and non-promoted prices for the grocery store channel is presented in **Figure 1**.

**Figure 1**
**Dial Complete (7.5 ounce)**
**Promoted Prices And Non-Promoted Prices In U.S. Grocery Stores**



b. <u>Promotional Pricing By Retailer</u>.  Over the 2009 to December 2, 2012 time period, on average, non-promoted prices were ███████████████████████ ████████████████████████████ **(Exhibit 9.)**  An illustrative example of the differences between promoted prices and non-promoted prices for Kroger is presented in **Figure 2**.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

**Figure 2**
**Dial Complete (7.5 ounce)**
**Promoted And Non-Promoted Prices In Kroger Banner Stores**



▫ Promoted    ■ Non-promoted

The price dispersion between promoted and non-promoted prices is even greater when examined at individual retailer locations (i.e., at a more disaggregated level). For example, during the week of July 13, 2009, ▮ (Additional examples are contained in **Exhibit 10**.)

c.    Use Of Coupons And Shopper Cards Affects Price.    I also understand (based upon a discussion with Dial personnel) that

i.    Coupons.    During the 2007 – October 2012 time period, consumers redeemed relating to Dial liquid hand soap products, including Dial Complete.    Out of these coupons, consumers redeemed at least for Dial Complete.[18]    (**Exhibit 11**.)

---

[18]

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

ii. <u>Shopper Cards</u>.   Usage of shopper cards also can affect price.   For example, Ms. Pearson – one of the Named Plaintiffs who resides in Illinois – testified that she primarily purchased Dial Complete at Super Target with her Target debit card which provides a 5% discount on every purchase.[19]

24.   <u>Dial Complete Average Prices Vary Based Upon Several Factors</u>.   In addition to the price variations discussed above relating to promotional activities, the retail prices paid for Dial Complete also vary based upon several factors including, but not limited to the (a) sales channel, (b) geographic location, (c) retailer, (d) time of purchase, and (e) product size purchased.   Illustrative examples are provided below.

a.   <u>Sales Channel</u>.   Generally, for the U.S. as a whole, retail prices of Dial Complete (7.5 ounce) were ██████████████████████████████[20] Over the 2009 – December 2, 2012 time period, Dial Complete average retail prices were ███████████████████████████████████ ██████ (**Exhibit 12** and **Figure 3**.)   I also have performed retail price comparisons by sales channel for selected California cities (i.e., Los Angeles, San Francisco, and San Diego).[21]   (**Exhibit 13**.)

███████████████████████████████████████████████████
███████

_____

[19] Pearson Deposition, pp. 35 – 36 and 79 – 80.

[20] ███████████████████████████████████████████████

[21] Aggregate data such as average retail prices across a particular sales channel (e.g., grocery stores) still mask significant variations in the retail prices charged by retailers.   This is because prices can (and do) vary across different locations and even the same retail outlet on different days.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

**Figure 3**
**Dial Complete (7.5 ounce)**
**Average Retail Prices By U.S. Sales Channel**



b.   <u>Retailer</u>.   In addition to retail price differences by channel of distribution, Dial Complete retail prices vary by retailer within the same channel.   (*See* **Exhibit 14** for an analysis of Dial Complete average prices across grocery stores; **Exhibit 15** for an analysis of Dial Complete average prices across drug stores; and **Exhibit 16** for an analysis of Dial Complete average prices across mass merchandiser.)  Dial's market pricing reports indicate significant price variation across (i) different retailers (**Exhibit 17**) and (ii) different locations of the same retailer over time (**Exhibit 18**).   As an illustrative example, Dial Complete average retail prices across mass merchandisers are presented in **Figure 4** below.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

---

**Figure 4**
**Dial Complete (7.5 ounce)**
**Average Retail Prices Across U.S. Mass Merchandisers**



    c.  <u>Product Size</u>.  The retail prices of Dial Complete also vary across different sizes. For example, in the U.S. grocery store channel, over the 2009 to December 2, 2012 time period, the average price of 7.5-ounce Dial Complete was ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ **(Exhibit 19**.)

      **ii.  The Named Plaintiffs' Testimony Reflects The Variability In Dial Complete's Retail Prices And The Difficulty Of Ascertaining Injury**

25.    The testimony of the current and former Named Plaintiffs further demonstrates the variation in Dial Complete retail prices paid by putative Class members.[22]  The Named Plaintiffs in this case purchased Dial Complete through various distribution channels and

---

[22] I understand that plaintiffs have not produced Named Plaintiff Mr. Capdeville for a deposition, so he is not included in my analysis.   However, I included former Named Plaintiffs Ms. Delivorias and Mr. El-Jandali in my analysis because they were deposed before they were dismissed from the lawsuit.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

retailers.   None of the Named Plaintiffs could identify the specific prices they paid for all of their Dial Complete purchases.   There is a wide range of estimated purchase prices paid for Dial Complete (i.e., from approximately $1.79 to approximately $4.00 per bottle).   A summary of the distribution channels and retailers where the current and former Named Plaintiffs have purchased Dial Complete and estimated prices paid is contained in **Table 1**.   Additional details are provided in **Exhibit 20**.

**Table 1**
**Named Plaintiffs Made Purchases Of Dial Complete**
**In Different Channels Of Distribution**

| Putative Class | Named Plaintiff | Location Of Purchase | | | | Estimated Purchase Price |
| | | Grocery Stores | Drug Stores | Mass Merchandisers | Wholesale Clubs | |
|---|---|---|---|---|---|---|
| MO | Michelle Carter | Schnucks Dierbergs | | Target Walmart | | $1.94 (3 receipts, possibly for Dial Complete) Does not recall for other purchases |
| FL | Jonathan Cessna | Publix | CVS | | | $3.00 – $4.00 |
| LA | Bridget Delivorias | Matherne's (possibly) | CVS (possibly) Walgreens (possibly) | Walmart | | maybe around $3 |
| CA | Amani El-Jandali | | | | Costco | Does not recall |
| CA | Alicia Gentile | Ralph's | | Target | | $3.00 – $4.00 |
| CA | Sonia Herrera | | | Target | | Does not recall |
| OH | Jennifer Marazzi | Giant Eagle Heinens (possibly) Whole Foods (possibly) | Walgreens (possibly) | Target | | around $1.79 |
| IL | Kristina Pearson | | | Super Target | | maybe over $3.00 |
| WI | Megan Peterson | | | Walmart | | at most $3.00 |
| AR | Elizabeth Poynter | Kroger | | Target Walmart | Sam's | $2.50 – $3.00 |
| FL | Sven Vogtland | | | Target | | $3.50 – $4.00 |
| IL | David Walls | | CVS (possibly) Walgreens (possibly) | Target (possibly) Walmart (possibly) | | Does not recall |

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

26.     The current and former Named Plaintiffs also vary with regard to the products they have used and/or would have purchased in place of Dial Complete.   The alternative hand soaps identified by the Named Plaintiffs range from (a) bar soaps to (b) various types of liquid hand soaps to (c) dish washing liquids.   The purchase locations of these alternative hand soap products include (a) the same retailers where Named Plaintiffs purchased Dial Complete (as shown in **Table 1**), (b) natural foods supermarkets or specialty food stores, (c) department stores, (d) Bath & Body Works, and (e) luxury stores (e.g., Neiman Marcus or Kiehl's stores).   Similar to the variability in prices paid for Dial Complete, there is a wide range of prices paid for alternative hand soap products provided by a number of Named Plaintiffs (i.e., approximately $1.00 for Target brand liquid hand soap to $7.00 for Meyer's Clean Day liquid hand soap).   A summary of alternative hand soaps identified by the current and former Named Plaintiffs is contained in **Table 2**. Additional details are provided in **Exhibit 21**.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

**Table 2**
**Alternative Hand Soaps Identified By Named Plaintiffs**

| Putative Class | Named Plaintiff | Liquid Hand Soap | Bar Soap | Dish Washing Liquid |
|---|---|---|---|---|
| MO | Michelle Carter | | Ivory | |
| FL | Jonathan Cessna | Gud Natural Foaming Hand Wash Softsoap | | Palmolive |
| LA | Bridget Delivorias | | Oil of Olay Dove | |
| CA | Amani El-Jandali | | Dial Other brands | |
| CA | Alicia Gentile | Softsoap | A handmade bar soap | |
| CA | Sonia Herrera | Bath and Body Works antibacterial foaming liquid hand soap | | |
| OH | Jennifer Marazzi | Softsoap (including a Softsoap product with minerals) Target brand Giant Eagle brand Method (possibly) Bath & Body Works hand soap | | |
| IL | Kristina Pearson | Up and Up (Target brand) non-antibacterial Softsoap antibacterial/non-antibacterial | | |
| WI | Megan Peterson | Method Softsoap | | |
| AR | Elizabeth Poynter | | Dove | Palmolive |
| FL | Sven Vogtland | Meyer's Clean Day liquid hand soap Softsoap Pampered Hands foaming hand soap Another Softsoap liquid hand soap J.R. Watkins Natural Hand Soap Kiehl's liquid hand soap | Lever 2000 | Dawn Ultra Concentrated |
| IL | David Walls | Softsoap | Ivory | A dish washing liquid |

27.    In addition, even on an individual Named Plaintiff basis, there is a lack of economic evidence that would allow a reliable determination of the claimed economic injury. Based upon the deposition testimony provided by the Named Plaintiffs, two of the 12 deposed current and former Named Plaintiffs could provide receipts for only a portion of their purchases of Dial Complete.[23]    The remaining 10 of the 12 deposed current and

---

[23] These two Named Plaintiffs are Ms. Jennifer Marazzi and Ms. Michelle Carter.    Ms. Marazzi retained only one receipt and it is not legible.    (Marazzi Deposition pp. 69 – 73 and Marrazzi Deposition Exhibit 5.)    The three

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

---

former Named Plaintiffs testified that they (a) did not keep any of the receipts when they purchased Dial Complete, (b) could not remember the specific prices they paid for Dial Complete, and (c) would not be able to substantiate the quantity or the prices associated with their Dial Complete purchases.[24]  Only one of the 12 deposed current and former Named Plaintiffs (i.e., Ms. Michelle Carter) could provide one receipt showing the hand soap product she has purchased in place of Dial Complete.[25]

28. In the absence of documentary evidence that substantiates Named Plaintiffs' purchases of Dial Complete (including the quantity of their purchase and the actual prices paid for Dial Complete), it would not be possible to reliably determine the economic damages allegedly suffered by individual Named Plaintiffs, let alone on a Class-wide basis.

### iii. Summary

29. Based upon (a) analysis of retail sales and pricing data and (b) deposition testimony provided by the Named Plaintiffs as discussed above, Class-wide proof would not provide a reliable measure of whether or to what extent any member of the Class suffered any economic injury.

30. Actual retail sales data indicate that the retail price of Dial Complete varies depending upon, among other things, the geographic location, the sales channel of the retailer, the purchase date, and the availability of promotional or coupon discounts.  The data show that the price paid by one consumer in one place at one time for Dial Complete is not

---

receipts Ms. Carter provided reflect three separate purchases of "hand wash," which Ms. Carter believed to be Dial Complete.   (Carter Deposition, pp. 20 and 23 – 24 and Carter Deposition Exhibit 3.)

[24] Delivorias Deposition, pp. 107 and 205 – 206; Pearson Deposition, p. 203; Poynter Deposition, pp. 14 – 15, 42 and 80 – 81; Gentile Deposition, pp. 85 and 150; Peterson Deposition, pp. 67 – 70, 95, 100; Vogtland Deposition, pp. 58 – 63; Walls Deposition, pp. 100 – 102, 170 – 174; Cessna Deposition, pp. 96 – 97, 101; Herrera Deposition, p. 43; El-Jandali Deposition, pp. 92 – 93.

[25] Ms. Carter provided one receipt that reflects a purchase of Ivory bar soap from Schnucks for $1.39.   (Carter Deposition, p. 25 and Carter Deposition Exhibit 3.)

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

indicative of the price paid by another consumer in a different location at a different time. Under these varied conditions, to determine the actual price paid by any particular putative Class member (and whether there was any price premium paid that was associated with the Challenged Claims) would require consideration of circumstances particular to that transaction.

31.    Consequently, Class-wide proof using aggregate data does not produce a reliable or accurate way to demonstrate the fact of injury or the quantum of injury. Even assuming that the Challenged Claims are false, Class-wide proof (a) would not demonstrate economic harm as to any particular Class member, (b) would result in over-compensation to some Class members, and (c) would result in under-compensation to other Class members.

**B.    The Claimed Damages Measures Proposed By Dr. Rosen Do Not Yield An Appropriate Or Reliable Measure Of Economic Harm**

32.    Four "financial metrics" relating to the Challenged Product are presented in the Rosen Report as potential measures of claimed damages:

a.    disgorgement of the total purchase price paid by consumers;

b.    disgorgement of the total wholesale price charged by Dial;

c.    disgorgement of the profit contribution accruing to Dial from sales of the Challenged Product; and

d.    disgorgement of any price premium paid by consumers for the Challenged Product relative to "alternative competing substitute products that provide consumers with the same health benefits . . . including anti-bacterial and non-antibacterial liquid hand soaps or other comparable products."[26]

33.    Accurately assessing economic injury suffered by consumers purchasing the Challenged Product requires that Dr. Rosen determine the value paid versus value received by a

---

[26] Rosen Report, pp. 2 – 3.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

---

consumer.   However, none of the proposed damages measures do so and, hence, would not provide a reliable or relevant measure of economic injury (if any) suffered by consumers purchasing the Challenged Product.

### 1. Dr. Rosen's Price Premium Methodology Is Incomplete And Unreliable

34.    The price premium methodology and "preliminary analysis" presented in the Rosen Report are incomplete and do not yield a reliable or relevant estimate of the harm suffered by individual putative Class members (i.e., a loss caused by the Challenged Claims) for at least the following reasons.

### i. Dr. Rosen's Price Premium Approach Does Not Provide A Method Of Establishing Injury On A Class-wide Basis

35.    Dr. Rosen incorrectly asserted that using his price premium approach, "members of the Classes' damages can be computed as the circumstances would be common to each consumer."[27]   However, the price differential (if any) actually paid by any particular Class member would depend upon:

a.  the price paid by the individual Class member for Dial Complete (which depends upon many factors as discussed previously); and

b.  the price of the relevant benchmark product(s) at that Class member's time of purchase (which also can depend upon many factors).

36.    Whether putative Class members paid a price premium for the Challenged Product only can be determined reliably based upon the circumstances of the relevant individual transactions (and similarly-situated transactions).   There would not be a single "price premium" measurable by Class-wide proof.   Awarding an "average premium" as proposed by Dr. Rosen would result in a windfall gain to a significant number of putative Class members who actually suffered no injury (e.g., consumers who purchased Dial

---

[27] Rosen Report, p. 6.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

---

Complete at a discount exceeding the "average premium" and consumers who purchased Dial Complete for reasons unrelated to the Challenged Claims). Likewise, assuming that the Challenged Claims are false and assuming that the Class members suffered an injury, awarding an "average premium" would cause other Class members to be undercompensated. Dr. Rosen acknowledged in his deposition that his method would undercompensate some members and overcompensate others.[28] Thus, the price premium approach proposed by Dr. Rosen is not amenable to Class-wide proof, and claimed damages (if any) cannot be determined on a Class-wide basis using the proposed price premium approach.

### ii. Dr. Rosen Provides An Incomplete Description Of How A Price Premium Attributable To The Challenged Claims Could Be Identified

37.    In his report, Dr. Rosen described "calculating the average differences in retail prices between Dial Complete and a range of alternative competing substitute products" and "determin[ing] an average premium charged." However, Dr. Rosen acknowledged that any price premium calculated in such a manner for Dial Complete "would need to be analyzed to determine whether or not any premium found could be attributed to product characteristics, other than the Challenged Claims."[29] Based upon this description, Dr. Rosen's proposed approach would require the following three steps:

a.    identification of suitable benchmark products for Dial Complete;

b.    calculation of the price differential between Dial Complete and benchmark products; and

c.    apportionment of the price differential to the Challenged Claims.

---

[28] Rosen Deposition, pp. 103 and 141.

[29] Rosen Report, pp. 2 and 4.

CONFIDENTIAL

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

___

However, Dr. Rosen provided no explanation of how he would identify suitable benchmark products, and Dr. Rosen provided only an incomplete description of how he would apportion a price differential to the Challenged Claims.

38.    <u>Identification Of Benchmark Products</u>.    Dr. Rosen did not explain in his report how he would identify suitable benchmark products for Dial Complete.    Although Dr. Rosen asserted in his report that he would use "a range of alternative competing substitute products that provide consumers with the same health benefits . . . including anti-bacterial and non-antibacterial liquid hand soaps or other comparable products,"[30] Dr. Rosen testified in his deposition that he has not identified which benchmark products he would use or whether he ultimately would use "a range" of benchmark products or only one.[31]

39.    <u>Calculation Of Price Differential</u>.    Dr. Rosen's proposed calculation of "average differences in retail prices" between Dial Complete and benchmark products masks important variations in the price differential (if any) paid by each individual Class member.    The price differential (if any) will depend upon the price paid by the individual Class member for Dial Complete (which depends upon many factors discussed throughout my report) and the price associated with the benchmark product for that individual Class member (which also depends upon similar factors).

40.    <u>Apportionment Of Price Differential</u>.    The Rosen Report provides only an incomplete description of how an apportionment analysis could be performed.    According to Dr. Rosen, "a variety of different statistical and analytical tools" could be used to determine the portion of any price premium allegedly attributable to the Challenged Claims (i.e.,

___

[30]  Rosen Report, p. 2.

[31]  Rosen Deposition, pp. 121 and 221 – 222.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

multiple regression, logit regression, market survey data, and actual sales data).[32]

However, no details were provided regarding the conceptual, implementation, or data issues that would be faced if these tools were used.

a. No Details Regarding Proposed Regression Analysis. Dr. Rosen provided no details regarding how the proposed regression analyses would be specified and no explanation as to how the product characteristics described in his report could be modeled as explanatory variables for the proposed regression analyses. Moreover, Dr. Rosen failed to demonstrate that all of the differences between Dial Complete and benchmark products could be represented by specific explanatory variables that would allow the proposed regression analyses to effectively separate out the effects of those differences from the effect (if any) of the Challenged Claims on pricing. In deposition testimony, Dr. Rosen reiterated that his proposed price premium analysis would require "some form of regression analysis or something similar," but Dr. Rosen testified that he had not yet developed the proposed regression analysis or identified the specific dependent or independent variables he would use.[33]

b. No Details Regarding Proposed Elasticity Calculations. In his report, Dr. Rosen discussed "demand elasticity" and "cross elasticity of demand" as relevant to the determination of the claimed price premium, but he provided no details regarding how he actually would measure (or use) the relevant elasticities.[34] In addition, Dr. Rosen testified that he did not know whether data necessary for his proposed elasticity calculations would be available in this matter.[35]

### iii. Dr. Rosen's Preliminary Analysis Fails To Provide Evidence Of A Price Premium Attributable To The Challenged Claims

41.    To perform a "preliminary analysis" of the alleged price premium charged for Dial Complete, Dr. Rosen relied upon a set of market pricing reports reflecting regular and promotional pricing for a variety of soap products observed at individual retailer locations.[36] Dr. Rosen compared average prices of Dial Complete to average prices of "Dial Pump," which he was advised represented "a different product sold by Dial known

_____

[32] Rosen Report, p. 3.

[33] Rosen Deposition, p. 183.

[34] Rosen Report, pp. 3 – 4.

[35] Rosen Deposition, pp. 122 and 181 – 182.

[36] Rosen Report, pp. 5 – 6 and Market Pricing Reports (DIALCMPLT000084037R – 89R).

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

as Dial Gold that is not marketed with the Challenged Claims."[37]   Dr. Rosen concluded that "there was an average premium charged for 'Dial Complete' over 'Dial Pump' of approximately fifty-four cents ($0.54) per unit."[38]   Dr. Rosen's "preliminary analysis" is flawed and fails to provide evidence of a price premium attributable to the Challenged Claims for at least the following reasons.

### (1) Dr. Rosen Only Calculated A Price Difference, Not A Premium Attributable To The Challenged Claims

42.    In his "preliminary analysis," Dr. Rosen calculated only the price difference between Dial Complete and Dial Pump, not an alleged price premium attributable to the Challenged Claims.   Dr. Rosen acknowledged that the claimed average price premium "requires additional analysis . . . to account for the other differences between these two products that consumers are willing to pay for."[39]   In his deposition, Dr. Rosen described his "preliminary analysis" as "simple averaging" and testified that he identified only the "differential" between Dial Complete and Dial Pump, not the portion attributable to the Challenged Claims.[40]

### (2) The Average Price Differential That Dr. Rosen Calculated Masks Variation In Actual Retail Prices

43.    A review of the market pricing reports utilized by Dr. Rosen indicates that the "average premium" calculation performed by Dr. Rosen masks important variations in prices actually observed (and which putative Class members actually would have paid) at the various individual retailer locations.   For example, one market pricing report indicates

---

[37]   Rosen Report, p. 6.

[38]   Rosen Report, p. 5.

[39]   Rosen Report, p. 6.

[40]   Rosen Deposition, pp. 130 – 132, 153 – 154, and 198.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

that at a SaveMart Plus location in Tracy, CA in November 2008, the price observed for

Dial Complete (i.e., the $3.19 "promoted" price) was $0.10 <u>lower</u> than the price for Dial

Pump.   Even at that store's regular pricing, Dial Complete was priced only $0.10 higher

than Dial Pump (i.e., $3.39 vs. $3.29), significantly below the $0.54 claimed "average

premium" calculated by Dr. Rosen.[41]

### (3) Dr. Rosen's Benchmark Product Selection Was Arbitrary

44.    Dr. Rosen testified that "Dial Pump" was identified by Plaintiffs' counsel as "the most

comparable" benchmark product for Dr. Rosen to use.[42]   Dr. Rosen further testified that

he needs "to spend more time determining whether the substitutes may be appropriate"[43]

and has not determined which substitute products he would use as benchmark products

for his proposed analysis.[44]   As discussed below, the selection of Dial Pump (by

Plaintiffs' counsel) for a benchmark product was arbitrary and caused Dr. Rosen to

calculate a price differential for reasons unrelated to the Challenged Claims.

45.    In particular, based upon a discussion with Dial personnel, it is my understanding that

Dial Pump is a viscous liquid hand soap with a lower suggested retail price than Dial

Complete foaming hand soap.   According to Dial personnel, foam pump products cost

more to manufacture than viscous pump products, and that difference in manufacturing

costs is one factor driving differences in the wholesale pricing and the suggested retail

_____

[41]  Market Pricing Report, N. California, November 10, 2008.   (DIALCMPLT000084063R – 72R at 63R.)   This
market pricing report is among the references listed in the Rosen Report.   (Rosen Report, p. 8.)

[42]  Rosen Deposition, pp. 216 – 217.

[43]  Rosen Deposition, p. 120.

[44]  Rosen Deposition, p. 121.   According to Dr. Rosen, he "would have to get the advice [regarding appropriate
benchmark products] from other individuals maybe from a marketing person or a production person."   Dr. Rosen
testified that "company personnel and employees" would be a potential source of information regarding the selection
of appropriate benchmark products.   (Rosen Deposition, pp. 221 – 222.   (Bracketed text added for clarification.))

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

pricing for foaming hand soaps and viscous liquid hand soaps, whether sold by Dial or

Dial's competitors. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████    (*See* **Exhibit 22**).   An illustrative example of the price

differences between foaming hand soaps and viscous liquid hand soaps in U.S. grocery

stores is presented in **Figure 5**.

**Figure 5**
**Price Differences Between Foaming Pump And Viscous Pump Hand Soaps (7.5 oz)**
**U.S. Grocery Stores**



46.    As demonstrated in **Figure 5**, it is not unusual for foaming hand soaps to be sold at a

"premium" relative to viscous soaps.[45]   In addition, the "foam premium" observed for

---

[45]   The observation that there is a price premium for foaming hand soaps also is supported by documentary evidence.
████████████████████████████████████████████████████████████

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

———————————————————————————————————————

██████████████████████████████████████████████████████

████████████████████████████ is even larger than the difference in average

retail prices between Dial Complete and viscous Dial products. In light of these

observations, the "preliminary analysis" presented in the Rosen Report is based upon a

flawed comparison (i.e., of a foaming product to a viscous product) and fails to provide

evidence of a price premium attributable to the Challenged Claims. As discussed below,

the claimed "price premium" calculated in Dr. Rosen's "preliminary analysis" appears to

depend entirely upon the arbitrary selection of Dial Pump as the benchmark product.

47.   <u>Alternative Benchmark Products In Market Pricing Reports</u>.   Dr. Rosen failed to

acknowledge in his report that the market pricing reports he relied upon also included

pricing for (a) Dial Yogurt and (b) Tone foaming hand soap (i.e., other foaming hand

soaps sold by Dial and packaged in 7.5-ounce bottles but not marketed with the

Challenged Claims).[46]   At the majority of stores that carried both Dial Complete and

Dial Yogurt, the two products were priced identically.[47]   Similarly, at the majority of

stores that carried both Dial Complete and Tone foaming hand soap, the two products

were priced identically.[48]   (**Exhibit 23**.)   Dr. Rosen failed to explain in his report why

for his "preliminary analysis" he chose to compare the pricing of Dial Complete foaming

———————————————————————————————————————

████████████   (Kids Liquid Hand Soap Market presentation, dated January 4, 2011.
(DIALCMPLT000126917R – 24R at 18R – 19R.)   *See also*, Sommer Deposition, p. 277.)

[46]   Market Pricing Reports.   (DIALCMPLT000084037R – 89R.)

[47]   Among the 25 individual stores for which pricing was observed for both Dial Complete and "Yogurt Foam
Pump," 18 stores priced Dial Complete the same as Dial Yogurt.   Four stores priced Dial Complete lower than Dial
Yogurt, and two stores priced Dial Complete higher than Dial Yogurt.   In the one remaining store, Dial Complete
and Dial Yogurt had the same regular pricing, but a promoted (i.e., temporarily discounted) price was offered for
Dial Complete and not for Dial Yogurt.

[48]   Among the 20 individual stores for which pricing was observed for both Dial Complete and "Tone Foam Pump,"
15 stores priced Dial Complete the same as Tone.   Two stores priced Dial Complete lower than Tone, and two
stores priced Dial Complete higher than Tone.   In the one remaining store, Dial Complete and Tone had the same
regular pricing, but a promoted (i.e., temporarily discounted) price was offered for Dial Complete and not for Tone.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

hand soap to Dial viscous hand soap (yielding a $0.54 claimed price premium), rather

than Dial Yogurt and Tone foaming hand soap (which would have indicated that there is

no alleged price premium because those products do not use the Challenged Claims yet

are priced the same as Dial Complete).

48.    <u>Alternative Benchmark Products At The Wholesale Level</u>. ████████████████

████████████████████████████ Dr. Rosen's calculation of a claimed price

premium in his "preliminary analysis" was driven by his arbitrarily selected benchmark

and does not reflect a premium attributable to the Challenged Claims.   Although Dr.

Rosen's proposed approach and "preliminary analysis" were based upon retail prices,

Dial does not sell directly to consumers or set retail prices.   Dial sells its products to

distributors at wholesale prices. ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

a.    ████████████████████████████████████████
      ████████████████████████████████████ [50]

b.    ████████████████████████████████████████
      ██████████████████████████ [51]

_____

[49] ████████████████████████████████████

[50] Personal Care Business Unit Control Charts.   ("DIALCMPLT000001849-56.xls," "DIALCMPLT000001861-64.xls," "DIALCMPLT000001865-68.xls," "DIALCMPLT000001869-72.xls," "DIALCMPLT000001873-76.xls," "DIALCMPLT000001877-80.xls.")

[51] Personal Care Business Unit Control Charts.   ("DIALCMPLT000001849-56.xls," "DIALCMPLT000001857-60.xls," "DIALCMPLT000001861-64.xls," "DIALCMPLT000001865-68.xls," "DIALCMPLT000001869-72.xls," "DIALCMPLT000001873-76.xls,"   "DIALCMPLT000001877-80.xls,"   "DIALCMPLT000001881-84.xls,"   and "DIALCMPLT000001885-89.xls.")   I have not seen wholesale pricing information for any time period prior to 2007.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

If the Named Plaintiffs' allegations were true (i.e., that Dial Complete commands a price premium relative to comparable liquid hand soaps that are not marketed with the Challenged Claims), █████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

(**Figure 6**.)



Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

49.   Alternative Benchmark Products In IRI Data. 

a.   Identification Of Benchmark Products.   Given that Dr. Rosen's intent ultimately is to determine whether the pricing of Dial Complete includes a premium associated with the Challenged Claims, benchmark products should be chosen so as to minimize the likelihood that a price difference (between Dial Complete and the chosen benchmarks) would be due to factors unrelated to the Challenged Claims.   Below I have                                All of these benchmark products are similarly-situated to Dial Complete and are not accused of any misleading labeling or misrepresentations.   Due to limited data on antibacterial variants of competing branded foaming hand soaps,[53] these benchmark products are non-antibacterial (and do not contain triclosan).   I have utilized branded foaming hand soap products as benchmark products because:

---

[52]  To be clear, I am not opining that average pricing data could be used to determine injury on a Class-wide basis. Rather, I have compared average retail prices of Dial Complete to more carefully selected benchmark products in order to illustrate the flaws in Dr. Rosen's "preliminary analysis."

[53]

(IRI data,

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

    i.    ███████████████████████████████████
█████████████████████████ [54] and

    ii.    branded consumer products such as hand soaps generally are priced higher than their private label counterparts due to higher marketing and advertising costs (i.e., for reasons unrelated to the Challenged Claims). [55]

Thus, using branded foaming hand soap products as benchmarks reduces the likelihood that a price difference may be due to factors unrelated to the allegations in this dispute.

b.   **Analysis Of Retail Price Differences.**  ████████████████████
███████████████████████████████████████████████
████████████████████████████  Furthermore, the observed retail price differences between these products varied based upon a number of factors. Illustrative examples are provided below.

    i.    <u>Retail Price Differences By Sales Channel.</u>  Over the 2009 – 2012 period, price comparisons across U.S. sales channels demonstrate that ████████████
███████████████████████████████████████  In comparison with benchmark products, Dial Complete was ████████████████
████████████████████████████████████  (*See* **Exhibit 24** for detailed calculations and **Figure 7** for an illustrative price comparison in the grocery store channel.)  A comparison of ██████████████████████████████████████
████████████████████████████  (**Exhibit 25**.)

_____

[54] "Kids Liquid Hand Soap Market" (DIALCMPLT000126917R – 24R at 18R – 19R); based upon a discussion with Dial personnel; ███████████████████████████

[55] *See, for example,* "Grocery Store Brand: Private Brand versus Name Brand" (http://global-chica.hubpages .com/hub/Survival-of-the-Global-Brand-Amid-a-Global-Recession, viewed on January 8, 2013). Ms. Jennifer Marazzi, a Named Plaintiff in Ohio, testified that she would be willing to pay more for a brand name soap than a generic soap. (Marazzi Deposition, p. 106.) Dr. Rosen testified that branding is an important factor influencing consumers' purchasing decisions. (Rosen Deposition, p. 94.)

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

**Figure 7**
**Dial Complete (7.5 ounce) vs. Branded Foaming Hand Soaps**
**Average Retail Prices – U.S. Grocery Stores (2009 – 2012)**



ii.  Retail Price Differences Across Retailers.   Over the 2009 – 2012 period,  In comparison with benchmark products, Dial Complete was (*See* **Exhibit 26** for detailed calculations and **Figure 8** for an illustrative price comparison in Kroger banner stores.) [56] reveals similar results. **(Exhibit 27.)**

---

[56]

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

**Figure 8**
**Dial Complete (7.5 ounce) vs. Branded Foaming Hand Soaps**
**Average Retail Prices – Kroger Banner Stores (2009 – 2012)**



### iv. Dr. Rosen's Assertion That The Challenged Claims "Elevated The Price" Of Dial Complete Is Flawed And Inconsistent With Economic Evidence In This Matter

50.    In his deposition, Dr. Rosen testified that customers might have paid a premium associated with Dial Complete and caused by the Challenged Claims "whether they were interested in [the Challenged Claims] or not."[57]    Dr. Rosen testified that the Challenged Claims potentially may have "elevated the price" of Dial Complete for all customers.[58] According to Dr. Rosen, his proposed price premium approach would "try to decompose"

_____

[57]    Rosen Deposition, p. 163.    (Bracketed text added for clarification.)    *See also*, Rosen Deposition, p. 161.

[58]    Rosen Deposition, p. 163.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

the price of Dial Complete to identify the portion of the price caused by the Challenged Claims.[59]

51. Dr. Rosen's assertion that the Challenged Claims "elevated the price" of Dial Complete for all purchasers is akin to a "fraud on the market" theory, a term borrowed from security class action matters. However, class certification issues and class-wide damages issues in consumer product class action matters can differ significantly from those present in "fraud on the market" security class action matters.

   a. A "fraud on the market" type of security class action generally is predicated upon an efficient market premise. It is generally assumed that new information is disseminated quickly and reflected in the market price of the security in question. Generally, shareholders observe one market price of the security (an any moment in time) due to the national exchange nature of the security at issue. The allegedly fraudulent misrepresentation or omission is assumed to be incorporated into this single market price, as is the asserted corrective disclosure, and most putative Class members (in many cases) are asserted to have been impacted equally on a per share basis.

   b. In contrast, in a consumer product-related case, a different set of dynamics often is present. Consumers may purchase a liquid hand soap product and derive value for many different reasons (e.g., foam, fragrance, or color). Even with the same allegedly misleading labeling, the impact of the Challenged Claims on putative Class members may be different for a number of reasons (as discussed throughout my report). In addition, instead of one market price (as in the case of a security), the retail prices of a consumer product vary by sales channel, retailer, geographic area, timing, and whether promotional discounts are applied – leading to the necessity of individualized inquiry. Given the diversity of reasons for purchase, and given the diversity in prices paid, a "fraud on the market" approach (i.e., identifying one Class-wide claimed price differential associated with the Challenged Claims) fails as a reliable measure of claimed damages.

52. In addition, Dr. Rosen's assertion that the Challenged Claims "elevated the price" of Dial Complete is inconsistent with economic evidence and analyses discussed throughout my report, which suggest that no constant and/or systematic portion of the price of Dial Complete is attributable to the Challenged Claims. ██████████████████

---

[59] Rosen Deposition, p. 163.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

_____

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████ In

addition, there is no consistent retail price premium associated with Dial Complete

relative to appropriately selected benchmark products (i.e., benchmark products chosen to

minimize the likelihood that a price difference between Dial Complete and the chosen

benchmarks would be due to factors unrelated to the Challenged Claims).

### 2. Dr. Rosen's Total Purchase Price, Wholesale Price, And Profit Contribution Proposed Approaches Are Neither Relevant Nor Reliable

53.    Dr. Rosen's total purchase price, total wholesale price, and profit contribution proposed

approaches do not yield a reliable or relevant estimate of the harm suffered by individual

putative Class members (i.e., a loss caused by the Challenged Claims) for at least the

following reasons.

54.    No Adjustment For Value Received By Consumers.    A refund of total purchase price,

total wholesale price, or total profit contribution ignores the value received by each Class

member from the purchase of Dial Complete.    In his deposition, Dr. Rosen

acknowledged that purchasers of Dial Complete "did get clean hands" and therefore

"there is value received" even if the Challenged Claims are found to be false. [60]

Accurately assessing economic injury suffered by a consumer purchasing the Challenged

Product requires that Dr. Rosen deduct from the purchase price the value actually

received by the consumer.    However, Dr. Rosen testified that his total purchase price,

wholesale price, and profit contribution proposed approaches would not adjust or account

_____

[60]   Rosen Deposition, pp. 184 – 185.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

for the value received by putative Class members from their use of Dial Complete.[61] Consequently, Dr. Rosen's proposed measures would not yield a reliable measure of economic harm.

55.  <u>No Consideration Of Whether Putative Class Members Purchased Dial Complete Because of The Challenged Claims</u>.   If a putative Class member chose (and chooses) to purchase Dial Complete based upon considerations unrelated to the Challenged Claims, that Class member has not suffered harm because of the Challenged Claims.   However, Dr. Rosen testified that his total purchase price, wholesale price, and profit contribution proposed approaches would be based upon <u>total</u> sales of Dial Complete regardless of whether an individual purchaser read or relied upon the Challenged Claims.[62]   Thus, the claimed damages measures proposed by Dr. Rosen would include revenues or profits associated with putative Class members who actually suffered no injury.

56.  <u>No Apportionment Of Revenues Or Profits Attributable To The Challenged Claims</u>. Measuring the economic loss suffered by Class members requires identifying the damages or economic losses that are attributable to the alleged wrongful conduct.   For example, simply aggregating total retail sales revenues represents a mathematical calculation, but not a claimed damages calculation.   Dr. Rosen's proposed total purchase price, wholesale price, and profit contribution calculations would require an apportionment to determine the amount (if any) actually attributable to the Challenged Claims.   Dr. Rosen provided no mechanism for performing such an apportionment and testified regarding his profit contribution approach that his proposed approach would <u>not</u>

---

[61]  Rosen Deposition, pp. 186 and 204.

[62]  Rosen Deposition, pp. 183 – 184 and 204.

CONFIDENTIAL

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

isolate the impact of the Challenged Claims.[63]    Without an apportionment to the Challenged Claims, Dr. Rosen's proposed measures would overstate Dial's sales and/or profits (if any) attributable to the Challenged Claims.

57.    <u>No Consideration Of Purchase Prices Paid By Putative Class Members</u>.    As discussed earlier in my report, there is significant variation in the prices paid by individual Class members based upon a number of factors.    Therefore, there is no single "total purchase price paid" that can be determined for all Class members on a Class-wide basis.    Rather, individual inquiry would be required to determine the purchase price paid by each individual Class member.    Although Dr. Rosen asserted that his proposed approaches could be implemented using Class-wide proof, he has not provided any mechanism for allocating to individual Class members the portion of total retail sales, wholesale revenue, or profit contribution associated with each individual Class member's purchase(s).    For example, the Rosen Report does not state whether two putative Class members who purchased Dial Complete at different purchase prices and/or through different distribution channels (a) have suffered identical damages under his proposed approaches and (b) would warrant some as-yet-unspecified proportional distribution of the aggregate retail sales, wholesale revenue, or "profit contribution" measures.    The Rosen Report fails to provide sufficient details regarding how these approaches could be implemented to accurately provide a remedy to individual Class members that could compensate them for any claimed economic loss.

58.    <u>No Explanation Of How The Determination Of Variable And Fixed Costs Would Be Made</u>.    Dr. Rosen defined "profit contribution" as "the net monetary gain that results

---

[63] Rosen Deposition, p. 204.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

from sales revenue, after deducting the direct operating costs that would have been incurred to produce those sales."[64]   According to Dr. Rosen, this approach "would require information on total sales and cost information from Dial so that a determination of variable and fixed expenses associated with the production of Dial Complete could be computed."[65]   In his report, Dr. Rosen failed to explain how the determination of variable and fixed costs would be made.   Dr. Rosen also did not explain whether he would define "fixed costs" as costs that would not vary with additional <u>unit sales</u> or costs that would not vary with the introduction of additional <u>product lines</u>.   For example, in order to calculate the "profit contribution" of the entire Dial Complete product line, one would need to deduct costs related to market research and product research and development specific to Dial Complete (i.e., costs Dial would not have incurred if it had not developed and marketed Dial Complete).   Dr. Rosen did not address these issues in his report.

59.   <u>No Economic Evidence Of A Correlation Between Wholesale Prices And Economic Harm Attributable To The Challenged Claims</u>. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ ████[66]  ████████████████

---

[64]  Rosen Report, p. 4.

[65]  Rosen Report, p. 4.

[66]  Personal Care Business Unit Control Charts.   ("DIALCMPLT000001849-56.xls," "DIALCMPLT000001857-60.xls," "DIALCMPLT000001861-64.xls," "DIALCMPLT000001865-68.xls," "DIALCMPLT000001869-72.xls,"

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013



These facts, which Dr. Rosen does not acknowledge in his report, are inconsistent with Named Plaintiffs' theory that Dial charges a premium for Dial Complete attributable to the Challenged Claims.

---

"DIALCMPLT000001873-76.xls," "DIALCMPLT000001877-80.xls," "DIALCMPLT000001881-84.xls," and "DIALCMPLT000001885-89.xls.")

[67] In particular, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dial Complete NPD, p. 6 (DIALCMPLT000128340 – 58 at 45) and Dial Complete Relaunch, dated January 12, 2009 (DIALCMPLT000084025R – 34R at 28R).)

[68] Personal Care Business Unit Control Charts. ("DIALCMPLT000001849-56.xls," "DIALCMPLT000001857-60.xls," "DIALCMPLT000001861-64.xls," "DIALCMPLT000001865-68.xls," "DIALCMPLT000001869-72.xls," "DIALCMPLT000001873-76.xls," "DIALCMPLT000001877-80.xls," "DIALCMPLT000001881-84.xls," and "DIALCMPLT000001885-89.xls.") Wholesale pricing information for ▮▮▮▮▮▮ is available only for the time period from mid-2007 to mid-2010.

Expert Report of Keith R. Ugone, Ph.D.
April 24, 2013

---

\* \* \* \* \* \*

60.    My analyses, observations, and opinions contained in this report are based upon

information available to date.   I hold the opinions disclosed in this report to a reasonable

degree of economic certainty.   I reserve the ability to review documents, deposition

transcripts, or other information still to be produced by the Parties to this dispute and to

supplement my opinions based upon that review.


Keith R. Ugone, Ph.D.
April 24, 2013